SOUTHERN PINE LUMBER CO. v. CONSOLIDATED LOUISIANA LUMBER CO.

(Circuit Court of Appeals. Fifth Circuit. October 5, 1914.)

No. 2490.

PUBLIC LANDS (§ 173*)—TEXAS SCHOOL LANDS—LANDS SUBJECT TO SALE—CONSTRUCTION OF STATUTE.

Act Tex. April 15, 1905 (Laws 29th Leg. c. 103) § 8, providing for the sale by the Commissioner of the General Land Office of public lands of the state set apart by prior statutes to the public school fund, does not authorize the Commissioner to place upon the market or sell lands claimed adversely to the state and to the school fund in good faith under Spanish or Mexican grants until the controversy between the state and the claimants has been adjudicated in favor of the state.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. § 173.*]

In Error to the District Court of the United States for the Eastern District of Texas; Gordon Russell, Judge.

Action at law by the Consolidated Louisiana Lumber Company against the Southern Pine Lumber Company. Judgment for plaintiff, and defendant brings error. Reversed.

This suit was brought by the Consolidated Louisiana Lumber Company, hereinafter referred to as the Consolidated Company, a Louisiana corporation, against the Southern Pine Lumber Company, a Texas corporation, here-

inafter designated the Southern Company, to recover damages for the alleged wrongful conversion of timber cut, removed, and appropriated by the latter company from seven surveys of land situated in Trinity county, Tex., located and patented under a file made by Robb Stevenson, July 5, 1905, on top of the south league of the Jose A. Sepulveda grant, under which the Southern Company claimed title and the right to cut and remove the timber in question. The Southern Company filed a cross-action, making Henry B. Fall defendant; but, in view of the disposition made of the case, the cross-action becomes a matter of little importance.

Stevenson sought to purchase the land and timber thereon under and by virtue of section 8 of an act of the Texas Legislature, approved April 15, 1905. Session Acts, p. 159, c. 103. Under this file a survey was made by the county surveyor of Trinity county September 18, 1905, embracing 4,287½ acres and covering the south Sepulveda league, that was afterwards subdivided into the seven tracts in controversy. The surveyor's report showed a list of settlers, naming 19, who had improvements and inclosures on scrap school land known as the Sepulveda south league in Trinity county. On June 30, 1906, the county surveyor filed in the General Land Office at Austin field notes of the seven surveys, and on September 1, 1906, the Land Commissioner notified Stevenson that a survey had been made and that he had the right for 60 days to purchase the land and timber. Thereafter, Stevenson having made application to purchase the land and timber, and having complied with the statute as to the payment of the purchase money and in other respects, patents were issued to him in the name of the state for each of the surveys.

The record discloses that the Consolidated Company exhibited a chain of conveyances from Stevenson to itself, conveying the said several surveys with the timber thereon and all causes of action and claims for damages on account of cutting timber or committing other trespasses thereon. The Southern Company in defense relied upon a grant that had been issued to Jose Antonio Sepulveda upon a concession, made by Jose A. Saucedo (sometimes written Sancedo), a political chief of Mexico, in 1824, and afterwards confirmed by him in 1826. The Sepulveda concession was for two leagues of land, one to be located on San Pedro creek and the other on the Cochino; but, because one of the leagues applied for conflicted with the survey of Daniel McGulen, the alcalde, by virtue of an agreement between the interested parties, placed Sepulveda in possession of two leagues on the Cochino creek.

For a better understanding of the questions involved, the following substantially correct statement of the case by the Southern Company is here inserted:

"As shown by copy of the grant hereinbefore set out, Jose A. Sepulveda made application to the honorable political chief of the province of Texas, June 1, 1824. On July 20, 1824, Jose Anto. Saucedo acted on the application for two leagues of land and passed it to the alcalde of Nacogdoches, with instructions to see if the land was vacant, and, if so, 'to grant to the petitioner, Jose Antonio Sepulveda, and put him in possession, in the name of the government of the Mexican federation, of the two leagues that he solicits,' etc. On January 3, 1826, Sepulveda addressed another communication 'to the Honorable Chief of the Department of Texas,' complaining because one Daniel McGulen had prevented his being placed in possession of one of the leagues. Thereupon Saucedo entered the following order: 'San Fernando de Bexar, February 15, 1826. Considering that the interested party obtained through competent authority an order to be put in possession of the two leagues treated of in the foregoing petition, the alcalde of Nacogdoches should not have placed Daniel McGulen in possession of that which is situated at San Pedro. Therefore, pass to the present alcalde of that town, in order that he may have it vacated and put the petitioner in possession of the said two leagues in accordance with the decree of the political chief of this province. [Signed] Saucedo. [Rubric.]'

"Based on these orders, Luis Procela, the citizen constitutional alcalde of Nacogdoches, placed Sepulveda 'in possession of two leagues of land which according to said decrees he orders to be granted to said Sepulveda, one on San Pedro creek and the other on said Cochino; and for the reason that Daniel McGulen was already settled at San Pedro, having built houses and made

fields, the two parties saw fit to agree that there be given to said Sepulveda the two leagues together on the Cochino creek, so as to avoid all discord that could have been between them. The said agreement having been had, I began to extend the first measurement from said creek course to the south, where 10,000 varas were completed and a white oak with sufficient marks was set as a landmark; then extended the course to the west, where 10,000 varas was completed and a white oak was set as a mark; then running the same measurement, course north, 10,000 varas were completed, where adequate signs were placed; then running the same measurement, course east, 10,000 varas were completed to where we commenced—it being contiguous on all sides with vacant lands.' The alcalde placed Sepulveda in possession of said land, according to the grant, on the 16th day of March, 1826.

"Jose A. Sepulveda conveyed his grant to Samuel Maas by deed dated September 7, 1838, for a recited consideration of $5,000. Samuel Maas in turn conveyed by quitclaim deed to Jesse Duren and Daniel Daly, July 13, 1857, said two leagues, reserving out of the same the following tracts: 'Covered by several land certificates or headright claims known as the Alexander Henry claim, consisting of two-thirds of a league and one labor, for which patent was obtained for M. Seeligson and Maas, August 3, 1847; also the John Appleman claim, consisting of seven and one-third labors, patent obtained July 3, 1847; also Jacob Buhl.' Said Henry Appleman, and Buhl surveys were in partial conflict with the north league of said Sepulveda grant.

"Jesse Duren and Daniel Daly, and those holding under them, made numerous conveyances of portions of the south league of the Sepulveda grant, it being the portion covered by the Stevenson surveys in controversy, to a number of people, who put their deeds of record, paid taxes, and established their homes thereon; many living thereon for periods ranging from 10 to 50 or 60 years. It is not material here to trace their titles. It was admitted by plaintiff 'that the defendant Southern Pine Lumber Company had acquired, before file was made by Robb Stevenson on the surveys in controversy, whatever title Daniel Daly and Jesse Duren had to the timber which was in controversy, acquiring the same through a number of mesne conveyances, and that some of the deeds to the Southern Pine Lumber Company conveyed land and some timber on it, as set out in the defendant's answer.' It was further admitted 'that there are all told something over one hundred and twenty-five deeds in the chain of title set up by defendant to the various tracts of land and timber claimed by it, which have been from time to time filed and placed of record in Trinity county, Tex., at dates ranging from 1858 or 1859 to the present, but the bulk of them being placed of record since 1873. The intent of this admission is not to admit that the defendant in fact acquired title through this deed, but is to admit that they acquired whatever title Jesse Duren and Daniel Daly had to the land in controversy.' "

As disclosing the state's recognition of the Sepulveda grant, the statement of the Southern Company proceeds:

"As shown by the depositions of J. T. Robinson, Commissioner of the General Land Office, the Sepulveda two-league survey is delineated on the map of Houston county of 1841, the map of Houston county of 1858 and 1859, the map of Trinity county of 1862, the map of 1868 and 1877, the map of 1882, the map of 1896, and the present official map. He testified in part as follows: 'There is a map in this office bearing the following title: "A Map of Houston County" (copied from a map by George Aldrich by H. L. Upshur, draughtsman General Land Office, 1841). The J. A. Sepulveda title appears delineated on this map.' * * * 'The next map upon which I find the J. A. Sepulveda title delineated is that of Houston county of 1858 and 1859, by C. C. Stremme.' 'The next map upon which I find the J. A. Sepulveda title delineated is that of Trinity county, which according to its title was compiled by J. Browne in May, 1862, and drawn by R. Ricchel in June, 1862.' 'The next map upon which I find the J. A. Sepulveda title delineated is a tracing labeled "Houston County, December, 1877." ' 'The next map upon which I find said J. A. Sepulveda title delineated is that of Houston county, dated October, 1868.' 'The next map upon which I find the J. A. Sepulveda title delineated is that of Trinity county, of date 1882.' 'The next map upon which I find the J. A. Sepulveda title delineated is the present map of Trinity coun-

217 F.—46

ty, dated August 10, 1896, by Hill.' 'Said Sepulveda title is also delineated on the present official map of Trinity county of September, 1905.'"

The following correspondence between Messrs. Nunn & Nunn, Attorneys at law, and the Commissioner of the General Land Office, is disclosed by the record:

"Crockett, Texas, October 17, 1902.

"Hon. Charles Rogan, Austin, Texas—Dear Sir: You will please furnish us at your earliest convenience with information as to when the J. A. Sepulveda two-league grant of land in Trinity and Houston counties was first put upon the maps in your office, and also, if you can, explain why this grant for two leagues of land, with measurements embracing four leagues, should be put upon the map at all. Of course, it was done before you entered office; but we suppose an examination of the papers there will give us some information on this subject. We should like to know by what surveyor and at whose instance and when this map was made showing this land to be located. We do not think their lines could ever be located by the grant, and we must think that there has been some mistake about this matter.

"Yours truly,          Nunn & Nunn."

To which the Land Commissioner replied as follows:

"Messrs. Nunn & Nunn, Crockett, Texas—Dear Sirs: Replying to yours of October 17th last, would advise that the two leagues of the J. A. Sepulveda appear on all the old maps of Trinity county in this office, and on map of 1862 the claims appear as four leagues. As to when same was plotted on the maps of this office we are unable to state. The Spanish translator will give you such information as he may have as to the whole. The application of Sepulveda was dated June 1, 1824; the cession of two leagues, July 2, 1824; the second application, January 21, 1826; the second cession, or confirmation of the first, on the 19th of February, 1826; active possession of final title, March 15, 1826. In the meantime the colonization laws were passed March 14, 1824, which restricted headrights of this class to one league. The southern league having remained without adverse location on the maps of this office, being in the form of a square, and on the original survey, will not be disturbed after so many years, but will be presumed to be the one chosen by the owner and acquiesced in by the government. The corresponding clerk who has charge of this character of work has been sick, which caused a delay in answering your letter.

"Very respectfully,          Charles Rogan, Commissioner."

On April 25, 1862, the Commissioner addressed a letter, of which the following is a copy, to Hon. George F. Moore:

"George F. Moore, Esq., Nacogdoches—Dear Sir: Yours of the 15th inst. has been received. Contents noted. As there is no evidence of the title of Jose Antonio Sepulveda having been declared invalid by the courts, we will have to respect the title and not issue patent for any surveys that may have been made upon the land.

"Yours very respectfully,          S. Crosby."

It is further shown by the record that the Sepulveda grant has been included as a titled grant in the abstracts of titled lands, published under authority of laws of the state; that taxes have been paid for a great number of years on parts of the land by several parties; that numerous claimants have asserted title under the Sepulveda grant by buying and selling lands and placing deeds upon the records; and that the state has issued a number of patents calling for the boundaries of the Sepulveda survey.

Upon the trial of the cause the court gave the following peremptory instruction in favor of the Consolidated Company:

"The court charges you as a matter of law that the plaintiff has established the fact that it was the owner of the timber in controversy, and that the defendant had no title thereto. You are, therefore, instructed to find a verdict for the plaintiff for the value of the timber cut and removed by the defendant from the land in controversy, and the amount of your verdict must be determined from the evidence before you under the instructions which the court will submit for your guidance."

Under the instructions of the court the jury returned a verdict for damages in favor of the Consolidated Company, and also gave damages to the Southern Company against Fall on the cross-action, and judgment was accordingly rendered thereon. To the instructions of the court the Southern Company duly excepted, and prosecutes error to reverse the judgment.

Cone Johnson, of Washington, D. C., J. M. Edwards, of Tyler, Tex., George C. Greer and Ben B. Cain, both of Dallas, Tex., R. O. Kenley, of Groveton, Tex., and Johnson & Edwards, of Tyler, Tex., for plaintiff in error.

E. W. Townes and Thomas H. Ball, both of Houston, Tex., T. N. Jones, of Tyler, Tex., W. D. Gordon, of Beaumont, Tex., and L. A. Carlton, of Houston, Tex., for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge (after stating the facts as above). It is a well-recognized principle of law that, in actions of trespass to try title, the plaintiff must recover upon the strength of his own title. If, then, the Consolidated Company exhibited a valid title in itself to the timber and land in controversy, the judgment was right. But if, on the other hand, the title relied upon by it was invalid, the judgment was wrong. We are thus brought to a consideration of the question of the validity or invalidity of the title exhibited by the Consolidated Company, and upon its solution will depend the result of the present suit.

To solve the question it becomes necessary to ascertain whether the Commissioner of the General Land Office of Texas had authority to place the land upon the market for sale and to issue patents to Stevenson; it being conceded that, if the authority existed, the patents passed an indefeasible title to Stevenson and to his remote vendee, the Consolidated Company.

The question suggested was directly raised by the Southern Company in the following requested instruction, which was refused by the trial court:

"The evidence in this case shows that the land and timber in controversy was not on the market subject to sale by the Commissioner of the Land Office at the time the applications were made to purchase the same, nor at the time the land or timber was awarded to Stevenson, nor at the time the timber deeds were executed or the patent to the land issued, and the act of the Commissioner in attempting to sell the land and timber was without authority of law and passed no title to the plaintiff, and the plaintiff cannot recover in this case, and you will find a verdict for the defendant."

It has been shown in the statement of the case that Stevenson made the purchase of the land and timber under section 8 of the Act of 1905, and it clearly appears that, in making his purchase, he complied with the provisions of the act. If the Land Commissioner had authority to place the land upon the market and sell the same, Stevenson's title was unassailable. Did he have such authority?

After carefully considering the question we have reached the conclusion that he did not have the authority claimed. Generally speaking, it may be said that he was invested with authority to sell the lands

belonging to the school fund as provided by the act of 1905; but where lands were held, occupied, or claimed by any person, association, or corporation adversely to the state, or to such fund, they formed no part of the school fund until their recovery by the state in a suit instituted by the Attorney General. Section 8, Act Feb. 23, 1900. See Session Acts 1900, First Called Session, pp. 33, 34. And we think this is especially true in respect of lands held or claimed by persons adversely to the state and to the school fund under Spanish or Mexican titles, since it is expressly provided in section 8 of the act of 1905:

"That land heretofore or hereafter recovered by the state from claimants holding or claiming same under Spanish or Mexican titles shall be considered as vacancies disclosed by the official maps, and the person who in good faith so held or claimed such land under the claim aforesaid shall have a prior right for ninety days after the taking effect of this act, or after the date of final recovery of such land hereafter, to file on and purchase four sections of six hundred and forty acres each for cash," etc.

In 1904 a similar question was passed upon by the Supreme Court of Texas in Juencke v. Terrell, Commissioner, 98 Tex. 237, 239, 82 S. W. 1025, 1026, in which was construed section 6 of the act of 1900. The reasoning of Mr. Chief Justice Gaines applies with peculiar force to the present case, and the opinion is inserted in its entirety:

"This is a motion for leave to file a petition for a writ of mandamus against the Commissioner of the General Land Office. The facts relied upon for the grant of the writ, briefly stated, are as follows: In the year 1904 the relator, desiring to purchase a tract of 640 acres of land in Liberty county under the act of April 15, 1901, amendatory of the sixth section of the act of February 23, 1900, which set apart the unappropriated public domain of the state to the public school fund and provided for its sale, filed his application to purchase, caused a survey to be made by the surveyor of the county, and the application and field notes to be returned to the Land Office. For the purposes of this opinion it may be assumed that all the requirements of the statute were complied with. The Commissioner refused to approve the field notes, and to classify and value the land, and to place it upon the market, because the survey was 'in conflict with what appears to be a prior and incomplete grant of a league of land made by the governments of the states of Coahuila and Texas to Phillip P. Dever.' The petition further alleges, in substance, that R. M. Vaughan and F. P. Works claim to be owners of, or to have some interest in, the tract sought to be purchased, and that they claimed under the incomplete grant before mentioned.

"We are of the opinion that, where there is a dispute as between the state and another party as to the title to a tract of land, the Commissioner cannot be compelled to make a sale. It is hardly within the scope of his functions or duties to pass upon titles in such cases; and we should be reluctant to hold that the Legislature intended to impose such duty upon him, in the absence of language in the statute showing clearly that intent. It is known that at the date of the original act which appropriated these lands to the school fund there were many large bodies of land lying in the state held by persons who asserted title thereto, and whose titles had never been adjudicated and were not conceded. It is unreasonable to suppose that the Legislature intended to put such lands upon the market for sale, and thus to turn loose upon the courts a flood of litigation as between the purchasers and the adverse claimants. On the contrary, we think that the purpose of the Legislature with reference to them is shown by the eighth section of the act. That section in part is as follows: 'When any of the lands described in this act, or any of the other public lands of the state held or owned by any fund, or any land in which this state or any such funds have an interest, are held, occupied or claimed by any person or association or corporation, adversely to the state, or to such fund, it shall be the duty of the Attorney General to

institute suit therefor,' etc. From this we think it is to be inferred that the policy of the Legislature in reference to lands which were claimed by third parties was first to establish its title before putting them upon the market for sale, and that it was not intended that they should be sold until the controversy between the state and the claimants had been adjudicated.

"The present Constitution contains this provision: * * * 'All genuine land certificates heretofore or hereafter issued shall be located, surveyed or patented only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the state, evidence of the appropriation of which is on the county records or in the General Land Office; or when the appropriation is evidenced by the occupation of the owner, or of some person holding for him.' Const. art. 14, § 2. This provision does not prohibit the Legislature from providing for the sale of such lands; but it very clearly evinces the policy of the state not to encourage litigation by permitting the acquisition from the state of lands which appear upon the official records, or by actual occupancy, to be claimed adversely to it. It should not lightly be assumed that the Legislature intended to depart from that policy.

"Our conclusion is that section 6 of the act under construction applied only to such lands as appeared upon the maps and records of the General Land Office not to be claimed by other parties and to such as had been adjudged to the state, if ever so claimed."

In view of the fact that the south league of the Sepulveda grant, the land involved in the present controversy, has been claimed adversely to the state since 1824; that it has been for more than half a century delineated upon the maps of the Land Office, and regarded by that office, or by some of its incumbents, as a valid grant; that there are, and have been for a number of years, numerous persons residing on the land, paying taxes and claiming under the Sepulveda title; and in view of other pertinent facts appearing in the statement of the case—it is, repeating the language of the Supreme Court, "unreasonable to suppose that the Legislature intended to put such lands upon the market for sale, and thus to turn loose upon the courts a flood of litigation as between the purchasers and the adverse claimants." We are firmly impressed with the conviction that it was the intention of the Legislature, as manifested by the acts to which reference has been made, to reserve from sale lands claimed adversely to the state and to the school fund in good faith under Spanish or Mexican grants, "until the controversy between the state and the claimants has been adjudicated" in favor of the state. In the absence of such adjudication the lands could not be legally placed upon the market for sale; and it follows that the act of the Commissioner in selling the land in question to Stevenson was against the law, and hence without validity.

We are unable to give our assent to the suggestion, made by the Consolidated Company, that the Legislature intended, either by the act of 1905, or by any subsequent legislation, to change or in any manner to modify the rule announced in Juencke v. Terrell.

It is further stated by counsel in their brief that the question here involved was determined in favor of the Consolidated Company by the Attorney General and Land Commissioner, and that the practical construction of those two officials is of great weight, and should be so regarded by a United States court in construing a state statute. In this connection counsel refer to G., H. & S. A. Ry. Co. v. State, 77

Tex. 567, 12 S. W. 988, among other authorities. In 77 Tex. at page 388, 12 S. W. 995, it was said by the court:

"But when, as in this case, seven successive Legislatures have through a period of 13 years acted upon a given construction of the Constitution; when the department intrusted with the immediate administration of the land system of the state has uniformly concurred in that construction, and when successive Governors of the state, eminent for their patriotism and intelligence (more than one of them having first served with distinguished success in this court), have approved it, we feel that nothing less than an absolute conviction that they have all been wrong would justify us in so deciding."

The principle announced is a salutary one, and would be readily applied in the present case, if the facts here involved were in the slightest degree similar to those appearing in the case cited. Without discussing the testimony, we deem it only necessary to say that the principle is wholly inapplicable to the case at bar.

Having reached the conclusion that the title of the Consolidated Company is without validity, and hence that that company must fail in the suit, it becomes unnecessary, as it would be improper, in the absence of real parties in interest, to determine whether the south league of the Sepulveda is a subsisting valid grant. Upon that question, therefor, we intimate no opinion.

In view of the foregoing, we are of the opinion that the trial court erred in refusing to give the instruction requested by the Southern Company, and for the error thus committed the judgment against that company and Fall should be reversed, and the cause remanded for a new trial. And it is so ordered.

NOTE BY THE COURT.—Some days prior to his death, Judge SHELBY communicated by letter his concurrence in the foregoing opinion.